**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

UNITED STATES OF AMERICA,

Plaintiff,

v.

ABDIKADIR AINANSHE MOHAMUD,

Defendant.

Court File No. 22-cr-223 (09)(NEB/DTS)

**DEFENDANT'S POSITION ON SENTENCING**

---

The Defendant, Abdikadir Mohamud, respectfully submits his position on sentencing and requests a downward variance for the reasons set forth herein. He presents several mitigating factors that weigh against imposing a strict guidelines sentence despite the seriousness of the offense.

Mohamud has been on pretrial supervision since September, 2022 without any problems. During the last four years, he has continued his education and maintained employment. He and his wife welcomed two children into their family since he was charged in this case. The youngest child has a genetic disorder and requires significant care that will continue for her lifetime. Mohamud comes before the Court with significant stress not just about his daughter's well-being, but more so about his ability to care for her and to provide for his family.

Meanwhile, public sentiment about the overall Feeding Our Future prosecution has become increasingly hostile as the case has been politicized. There is understandable resentment about the staggering amount of money diverted from the public good during

a pandemic that disrupted everyone's lives. However, Mohamud and many in the East African community, are increasingly worried about their safety both in terms of attitudes toward their community, families, and themselves personally. The current political environment essentially encourages people to give in to hatred of all East African immigrants. Political figures openly foment ant-Somali attitudes and suggest collateral consequences for Minnesotans of Somali descent.[1] Vague references to fraud in Minnesota formed the initial impetus for the surge of ICE agents into our state.[2]

Certainly, this charged rhetoric is problematic in many ways. It is now part of the political discourse in Minnesota precisely because opportunistic politicians want to exploit the genuine concern many people have about the breadth of the instant case. The Court is surely cognizant of this situation. Counsel would typically argue the Court should ignore the context of public opinion in terms of determining what is sufficient, but not greater than necessary to achieve the goals of federal sentencing. In the instant case, a just punishment for the offense should contemplate unknown extrajudicial consequences that will affect Mohamud well into the future.

Mohamud recognizes the sentencing considerations in this matter generally concern retribution for an egregiously large scale fraud versus a sentence that focuses primarily on the rehabilitation of offenders. This Court has always endeavored to fashion appropriate sentences in consideration of the unique circumstances of each defendant

---

[1] https://www.pbs.org/newshour/politics/watch-trump-says-he-doesnt-want-somali-migrants-in-the-u-s-calls-people-garbage; https://www.washingtonpost.com/nation/2026/01/21/trump-davos-somali-intelligence/

[2] cf. https://www.pbs.org/newshour/nation/a-timeline-of-trumps-immigration-crackdown-in-minnesota

and with due regard for the law. Mohamud humbly asks the Court to consider a sentence below the advisory guideline range, allowing him to be placed on home confinement as soon as possible. Mohamud is unlikely to reoffend or commit new offenses based on his lack of criminal history and his positive characteristics. He should be considered a low risk offender.

**PSR CALCULATION**

Mohamud has no outstanding objections to the PSR that require Court action. He fully accepted responsibility for his role in the offense and he did not file objections to the recommended guideline range since it did not differ from the plea agreement. The total offense level should be 24 in criminal history category I. The advisory range is 51-63 months.

The only area of controversy in the PSR concerns Mohamud's separation from his employment with WorldWide Language Resources in paragraph 147. Mohamud maintains he left this employment and was not terminated. He agrees there was a dispute regarding authorized travel off the military base where he was stationed, but he denies walking off the job. He claims the separation was amicable and not a termination of employment. Mohamud was offered another linguist position through a related employment agency in 2021. He fears the form provided to the US Probation Office by WorldWide was improperly created after his separation. This distinction is important to Mohamud because he wants to be depicted accurately before the Court.

There are no other objections to the PSR.

## BACKGROUND

Abdikadir Mohamud was born in Ethiopia, but he speaks the Somali language. He immigrated to Kenya with his family when he was a toddler. His mother passed away during this transition to Kenya. Mohamud was raised by his stern and detached father along with his extended family. His time in Kenya was fraught with danger due to his living arrangements in a high crime area. Mohamud's reluctance to regularly attend religious school often resulted in physical punishment. During the PSR interview, Mohamud became emotional recounting a series of sexual assaults involving his uncle in Kenya.

Mohamud moved to the United States with his father when he was twelve years old and settled initially in Ohio. He moved to Minnesota before high school, and drifted apart from his father. Mohamud embraced his new life in the United States, which fueled the split from his more traditional father. Eventually, Mohamud moved to Minnesota and lived with an aunt. The living arrangements in Minnesota were not ideal as Mohamud was not treated as an equal to his extended family. Despite the uncomfortable surroundings, Mohamud loved attending school and showed proficiency in many areas. He is fluent in four languages.

Upon graduation, Mohamud joined the United States Navy and served four years active duty. He was honorably discharged at the rank of E3 and received several awards or commendations. Mohamud's linguistic skills served him well in the Navy and beyond. Following his military service, he secured employment as a linguist for a translation service supporting U.S. special forces operators in Africa.

Mohamud returned to Minnesota in 2020 and found employment quickly. It was during this time he became involved in the activities associated with the instant case. Mohamud recalls the opportunity to join the Feeding Our Future program was presented to him by others already involved in the scheme. Initially, the program appeared to be legitimate and Mohamud believed it was both a means of earning income and doing good. He claims it didn't take long for him to realize the true nature of the program and those involved in it. Mohamud will forever regret his decision not to walk away from the scheme when he had a chance. In his acceptance statement, Mohamud expressed tremendous remorse. He made the decision to go all in with his co-defendants. He feels he let more than just his family down as a person who served our country honorably in the military. He knew better than to get involved in something so wrong, but he was blinded by the lure of what seemed like easy money while being encouraged by others. He was making decent income and could've gone back to a linguistics job in 2021 before he got involved with Feeding Our Future.

Since the instant case was charged, Mohamud's wife has given birth to two children. He now has a total of seven children. He and his wife are both educated and they work hard to provide for their family. The youngest child has a genetic disorder that prevents her from eating or drinking on her own. She spent the majority of her first year in the hospital. The prognosis for this child is generally positive, but she will require significant special needs for the rest of her life. Mohamud was still able to pursue higher education all while facing the instant prosecution and the stress of caring for his youngest child. He enrolled at Augsburg in Minneapolis in 2024 to study mechanical engineering

and he was recently accepted to the University of Minnesota for the same program. This is no small feat given the circumstances, but Mohamud is an intelligent and very hard working. He expresses a strong desire not to be a burden on the state.

While preparing this brief, it was hard to gauge the extent of how Mohamud profited from the fraud. After everything, he still has a mortgage on his home, which he purchased well before this case began. He lives modestly and did not purchase flashy jewelry or cars. This is not to say he didn't enjoy the proceeds of his involvement. But in comparison to other defendants, he acted more conservatively with the money. Any money he had in bank accounts and his interest in a commercial real estate deal was forfeited. His family gets by paycheck to paycheck.

Mohamud comes before the Court having recent surgery for Arnold-Chiari malformation, which affects how the cerebellum meets the upper spinal canal.[3] The surgery was a success and the expectation is that Mohamud will recover. However, he will require regular follow-up appointments and medication. The Bureau of Prisons is no longer equipped to properly handle medical issues. Budget cuts and chronic understaffing in the BOP make Mohamud's medical treatment dangerous and costly.[4] He is also vulnerable as an inmate due to his condition should he find himself confronted with violence in a BOP facility or if his condition requires immediate attention.

[3] https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010

[4] https://www.forbes.com/sites/walterpavlo/2025/11/21/deputy-director-of-bureau-of-prisons-describes-agency-on-the-brink/

## ARGUMENT

Mohamud respectfully requests a sentence below the advisory guideline range due to his lack of criminal history, his military service history and otherwise positive characteristics, his family support, showing of remorse, and his commitment to providing for his family. He will have a restitution order that will stretch his punishment well into the future as he attempts to satisfy the amount due. And, Mohamud has not only the consequence of a felony record, but the scarlet letter of being associated with one of Minnesota's most publicized fraud cases.

The Sentencing Reform Act of 1984 (Title II of the Comprehensive Crime Control Act of 1984) provides that a sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of sentencing: (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (2) deterrence; (3) protection of the public from further crimes; and (4) rehabilitation. See 18 U.S.C. § 3553(a). The 2025 amendments to the United States Sentencing Guidelines manual streamlined federal sentencing methodology. The 2025 version states in §1B1.1, there is a two step process: First, Courts must calculate the guideline range and determine sentencing requirements and options pursuant to the guidelines manual. Second, the Court must consider the factors set forth in 18 U.S.C. §3553(a). Traditional departures that appeared in the guidelines previously are now considered within the §3553(a) factors.

After calculating a defendant's advisory sentencing guidelines range and hearing from the parties, the district court must consider the sentencing factors set forth in 18

U.S.C. §3553(a) and make an individualized assessment based on the facts arriving at an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The district court "has wide latitude to weigh the [18 U.S.C.] section 3553(a) factors in each case and assign some factors greater weight than others in determining an appropriate sentence." *United States v. Richart*, 662 F.3d 1037, 1054 (8th Cir. 2011). Mohamud argues the §3553(a) factors, taken as a whole, support a downward variance below the guideline range. He seeks the ability to be placed on home confinement at the earliest time practicable because he has the ability to maintain employment, provide necessary care for his children, and complete his education in an effort to better himself. Mohamud also seeks the ability to obtain medical care for himself without placing a further burden on taxpayers.

Mohamud has no criminal history beyond simple traffic or parking violations. He has no history of substance abuse. By most metrics, he is highly likely to remain law abiding. Mohamud has an honorable military service history that bodes well for his ability to be successful on supervised release and beyond. While his service alone should not be viewed as a "pass" for criminal behavior, it is important to note how he served. Mohamud enlisted in the Navy and served four years. But then he signed up to provide direct support to special forces operations in danger zones. These jobs do not go to unqualified or untrustworthy people. This is why Mohamud feels so much remorse for his actions now- he made himself untrustworthy. Yet, he is presently working hard to rebuild his life and prove he can be trusted to contribute to our community rather than just take from it.

The judiciary sentencing data in the PSR indicates the average (and the median) length of imprisonment for similar offenders nationwide is 41 months. The facts of the instant case are perhaps unique just in terms of the loss amount. Mohamud argues the individual assessments of the various offenders nationwide would suggest a sentence in the guideline range is greater than necessary since many received a reduction.

Mohamud has a big family to care for and a large restitution amount to pay off. A purely punitive sentence of lengthy imprisonment may send a message of deterrence and respect for the law, but it also punishes more than just Mohamud. The community does not need to be protected from possible future crimes by this individual. Rather, he seeks to make amends for his crime by paying on his debt and positively contributing to society. The collateral consequences of this case will follow Mohamud perhaps the rest of his life. He respectfully asks the Court to consider the mitigating factors presented and give him the ability to pay back the people of Minnesota.

Law Office of Robert A. Lengeling, PLLC

Date: August 24, 2026

By *s/ Robert A. Lengeling*

MN ID# 304165
Lumber Exchange Building
10 S. 5th Street, Suite 800
Minneapolis, Minnesota 55402
(612) 963-1555
robert@lengelinglaw.com
ATTORNEY FOR DEFENDANT